## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HARRISON CAPEL,<br>350 S. 600 E., Apt 117<br>Salt Lake City, Utah 84102<br><br>BROOKE NORMAN,<br>147 Morgana Dr<br>Hertford NC 27944, and<br><br>ESTATE OF THOMAS DANIEL<br>CAPEL,<br><br>      Plaintiffs,<br><br>v.<br><br>LAURA CAPEL, and<br><br>DOES 1-9,<br><br>      Defendants. | **COMPLAINT**<br><br>Civil No. _____<br><br>Judge _____<br><br>(**JURY DEMANDED**) |

## COMPLAINT

## <u>INTRODUCTION</u>

1.     Plaintiff Harrison "Harry" Capel ("Harrison") is a recently retired United States Marine who is currently transitioning into civilian life while also dealing with the death of his father, Thomas Daniel Capel ("Dan Capel"), a retired Navy SEAL who passed away on May 28, 2016.

2.     Plaintiff Brooke Norman ("Ms. Norman") was married to Dan Capel on April 26, 2014, and remained married to Dan Capel until he passed away unexpectedly

on May 28, 2016.  Ms. Norman resided with Dan Capel continuously from November 2011 until his death, first in Washington, D.C. and then later in Hertford, North Carolina.

3.      Harrison, as Dan Capel's next of kin and heir, brings this action on behalf of the Estate of Thomas Daniel Capel (the "Estate").  Dan Capel died in North Carolina on May 28, 2016.  He had lived in North Carolina continuously since December 2014.

4.      Defendant Laura Capel ("Defendant"), upon information and belief, is a former wife of Dan Capel.  Pursuant to a separation agreement executed on February 5, 2014 between Defendant and Dan Capel (the "Separation Agreement"), Defendant has received numerous financial benefits from Dan Capel over the last several years.  Prior to the Separation Agreement, Defendant had demanded all sorts of financial benefits from Dan Capel,  in excess of those normally exchanged between long-estranged spouses.  A copy of the Separation Agreement is attached as Exhibit A.

5.      Defendant is currently engaged in several fraudulent and capricious litigations related to the death of Harrison's father, Dan Capel.  Defendant's purpose in these litigations is not only to line her own pockets, but also to maliciously and vindictively deprive Harrison and Ms. Norman of their rights to honor Dan Capel, including through a proper burial service.

6.      Defendant is no stranger to vexatious and fraudulent litigations. Regarding an entirely different action, a Senior Judge in a Pennsylvania Court held that Defendant's  appeal "in the said matter is frivolous."  The Senior Judge further found that Defendant's "appeal filed [in that matter] was done so principally for the purposes of

delay." Defendant clearly has no problems using the courts for frivolous proceedings meant only to achieve her own improper ends.

7.      Defendant's abuse of the courts is not limited to filing actions for offensive and harassing reasons. Defendant has repeatedly and knowingly made false representations to courts in both formal pleadings and sworn affidavits.

8.      Defendant has further defrauded the Internal Revenue Service by signing and filing tax returns that Defendant knew were false, as discussed below.

9.      Upon information and belief, Defendant has also forged documents, such as tax returns and other records, to hold herself out as the beneficiary of Dan Capel.

10.     Most egregiously, perhaps, Defendant has lied to several government agencies in this judicial district in an effort to try to obtain benefits as a spouse of Dan Capel, even though Defendant is fully aware that she is not entitled to those benefits. Defendant is literally trying to steal the inheritance and other rights due to Dan Capel's surviving son Harrison and surviving spouse Ms. Norman.

11.     Defendant has engaged in these fraudulent tactics and litigations for the most base of motives: greed. Defendant is upset that, due to Dan Capel's death, her enormous financial benefits are at an end. She has proven that she will commit any fraud and state anything, no matter how deceptive, in order to obtain (fraudulently) the benefits that rightfully belong to Harrison, Ms. Norman, and the Estate.

12.     Upon and information and belief, throughout Defendant's campaign of malice, her fraudulent tactics and litigations have been carried out with the assistance of Defendants Does 1 through 9 ("Co-defendants").

13.     Plaintiffs, Harrison, Ms. Norman, and the Estate, ask this court for relief, and in support, state as follows:

## PARTIES, JURISDICTION, AND VENUE

14.     Harrison Capel is a citizen of Utah.

15.     Brooke Norman is a citizen of North Carolina.

16.     The Estate of Dan Capel is properly situated in North Carolina.   Dan Capel lived continuously in North Carolina from December 2014 until his death—in North Carolina—on May 28, 2016.

17.     Defendant Laura Capel is a citizen of Pennsylvania.

18.     Defendant Does 1-9 have acted in concert with Defendant Laura Capel in connection with racketeering, fraud and other nefarious acts.

19.     This court has jurisdiction over this matter under 28 U.S.C. § 1332 because Plaintiffs and Defendants are citizens of different States and Plaintiffs have each suffered damages well in excess of $75,000.

20.     This court is a proper venue under 28 U.S.C. § 1391 because a substantial part of the events on which Plaintiffs' claims are based occurred in this District.   These include, but are not limited to, Defendant's racketeering activities, Defendant's

4

contacting several agencies in Washington D.C. in order to convert the property and rights of Plaintiffs, and Defendant's making several false statements that were directed at and caused injury in Washington, D.C., as explained below.

**STATEMENT OF FACTS**

21.    Dan Capel joined the Navy in the early 1980s.  After joining the Navy, Dan Capel went through SEAL training and became a Navy SEAL.

22.    Dan Capel was originally a member of Seal Team Four.  He was later selected to be a member of Seal Team Six.  After serving on Seal Team Six, Dan Capel was selected for another unit, Red Cell, an elite team comprised of Navy SEALS and one Force Recon Marine.  Dan Capel's service in the Navy was remarkable.  He was a true American hero.

23.    Dan Capel eventually retired from the Navy following a tragic incident where he "hit a high-voltage pole, face first, going forty miles an hour, then [free-fell] seventy feet."

24.    After retiring as a SEAL, Dan Capel became involved with various business ventures.  After the events of September 11, 2001, Dan Capel decided once again to join the fight.  He started working for the federal government in 2001, being sent to Afghanistan and Iraq to aid U.S. military efforts there.  From 2001 to the day of his death, Dan Capel continued to serve his government in war zones and elsewhere.

25.     Dan Capel's son, Plaintiff Harrison, likewise served this country. Harrison joined the Marines in 2011.  Harrison continued to serve actively as a Marine until May 2016, when he left the Marine Corps following a medical retirement.

26.     Harrison had been living with his former step-mother, the Defendant, the months prior to becoming a Marine.  When Defendant learned that Harrison wanted to become a Marine, she became enraged.  She lashed out at Harrison and kicked him out of their home with nothing but a plastic bag to hold his belongings.  Consequently, Harrison was forced to live in a hotel until Dan Capel and Ms. Norman, his future step-mother, took him in.[1]  He had to, in fact, enlist in the Marines from this hotel because Defendant had viciously and without notice kicked him out of his home.  All of this was because Harrison wanted to serve his country as a Marine.

27.     Defendant also lashed out at Dan Capel because of Harrison's decision to join the Marines.  She threatened Dan Capel and stated that Harrison's decision was Dan Capel's fault.  The Defendant accused Dan Capel of "breeding the military" into Harrison. Defendant's irate behavior was not based on any principled objection to violence nor was it based on any concern for Harrison's safety.  Rather, the Defendant was upset that Harrison would no longer be providing free services at her house and farm.  To that point, Harrison had been maintaining Defendant's house and farm.  The Defendant was upset that she would no longer have the free work done around the house and have to hire someone to take care of the farm work.

---

[1] Dan Capel and Ms. Norman were already living together by 2011, and lived together continuously since that time until his death in May 2016.

28.     Dan Capel's work for the federal government following September 11, 2001 is how Dan Capel met his current wife, now widow, the Plaintiff Brooke Norman. Ms. Norman graduated from the University of Chicago in 2000 with a degree in Philosophy.  Ms. Norman had plans to go to law school following her graduation.  In fact, she had been accepted by the University of Chicago law school, which is currently ranked as the fourth best law school in the nation.

29.     The events of September 11, 2001 deeply impacted Ms. Norman.  Ms. Norman's office had been located near ground zero at the time of the attacks. Shortly after September 11, 2001, Ms. Norman changed her plan and decided to work for the government in support of the country's war effort.  She withdrew her acceptance to the University of Chicago law school, enrolling instead in Middle Eastern studies and becoming fluent in Arabic. Ms. Norman graduated in 2005 from the University of Chicago with a master's degree in Arabic Studies.

30.     Ms. Norman started working for the federal government in 2004, using her skills to help the country.  Like her husband, Dan Capel, Ms. Norman has continued to work for the federal government to this day, frequently putting herself in harm's way in the world's most dangerous areas for the benefit of the country.

31.     Ms. Norman and Dan Capel met in November 2010.  By this time, Dan Capel had been separated from Defendant for four years.  Dan Capel separated from Defendant permanently in 2006.  At that time, Dan Capel moved out of the house in Pennsylvania, which he had shared with Defendant, and he never returned to live there.

32.     As will be testified to by Dan Capel's closet friends, his immediate family and others, Dan Capel had wanted to separate from the Defendant for some time prior to 2006 and expressed relief after the permanent separation.   After his separation, Dan Capel tried to see Defendant as infrequently as possible.   Dan Capel's friends in Pennsylvania will testify to the infrequency with which he went to Pennsylvania at all.

33.     According to his close family and friends, Dan Capel was very open about his separation from Defendant from 2006 on.   He lived in several locations since that time, none of which were with Defendant.

34.     As described above, Ms. Norman and Dan Capel began to date in November 2010, later moving in with each other in or around November 2011.

35.     As of December 2011, Dan Capel resided exclusively with Ms. Norman. They originally lived together in the Mount Pleasant neighborhood of D.C.   In September 2014, they moved together to Hertford, NC.

36.     Both Dan Capel and Ms. Norman are on the lease for the house they shared in Hertford, NC, where he resided until his death.   Dan Capel is listed on the utility bills for this house, as well.   Dan Capel's neighbors and friends in Hertford and surrounding areas will testify that he lived permanently in Hertford, NC with his wife, Ms. Norman.

37.     Part of the reason for the move to North Carolina was that Dan Capel was paying so much money to Defendant that he and Ms. Norman could not afford to live in Washington, D.C.   As discussed below, Defendant had strong-armed Mr. Capel into an

extortionate agreement requiring Dan Capel to pay Defendant essentially every dime he made.  The move to North Carolina would therefore allow Dan Capel and Ms. Norman to lower their costs so they could make it financially while still, together, affording his payments to Defendant.

38.     Dan Capel and Ms. Norman were married on April 26, 2014.  A copy of the marriage license is attached as Exhibit B.

39.     Their wedding was open and very public.  "Save the date" notices had been sent out to friends and family.  Invitations were later sent out.  Announcements had been made.  The couple even had a wedding website.  In fact, to date, a simple Google search of Dan Capel wedding reveals his wedding website with Ms. Norman as the second hit.

40.     Longtime close friends of the couple were invited and attended.  These friends included people who had known Dan when he was married to Defendant (and who knew Defendant).

41.     In addition to longtime friends, immediate and extended family members of both Dan Capel and Ms. Norman were invited to attend and did attend the wedding.  In addition to Dan Capel's other relatives, Dan Capel invited his son, Harrison, and his daughter to the wedding.  Harrison attended and was co-best man with Dan Capel's father.  Harrison had to seek permission to come back from a deployment overseas in order to attend the wedding.  Dan Capel's daughter, who upon information and belief lives with Defendant, declined to attend.

42.     Dan Capel's daughter, who Defendant claims to have adopted, also knew that her father had married Ms. Norman.  She was invited to the wedding.  Defendant claims to have a close relationship with Dan Capel's daughter.

43.     Most importantly, Defendant was told directly by at least one friend and former colleague of Dan Capel's that he had married Ms. Norman in 2014.  Consequently, Defendant had direct knowledge that Dan Capel was marrying Ms. Norman and that they were in fact married.

44.     Even though the Defendant knew that Dan Capel had married Ms. Norman, the Defendant never said anything to Ms. Norman (or anyone else of which we are aware) until the day that Dan Capel died.

45.     The attendees at the wedding of Dan Capel and Ms. Norman shared information about the event on social media.  Upon information and belief, Defendant was connected on social media to the some of same persons who were sharing pictures and news of the wedding.

46.     In short, Defendant was fully aware in April 2014 that Dan Capel had married Brooke Norman in a public ceremony surrounded by Dan Capel's friends and family.  Nothing was private about Dan Capel's and Ms. Norman's wedding, given especially that a Google search of Dan Capel reveals his wedding to Ms. Norman.

47.     Following the wedding ceremony, Ms. Norman and Dan Capel both publicly held themselves out to be husband and wife.  Dan Capel would introduce Ms. Norman as his wife to people he would meet.  Dan Capel's friends, including his long

time friends, all knew Ms. Norman to be his wife.    Dan Capel also told his business associates that he was married to Ms. Norman.

48.    In addition to holding Ms. Norman out very publicly as his wife, Dan Capel told his friends that he was divorced from Defendant.  Dan Capel told his close business associates that he was divorced from Defendant.  Dan Capel was unambiguous about this fact.

49.    Dan Capel told his close family members, as well as other relatives, that he had divorced Defendant. These family members will testify as such.

50.    In addition to Dan Capel telling people that he was divorced from Defendant, it was obvious to everyone who actually spent time with Dan Capel that he was not married to Defendant.  Simply put, Dan Capel spent in effect no time with Defendant while maintaining a continuous residence and living situation with Ms. Norman from November 2011 until the day he died.

51.    Dan Capel's whereabouts for the last several years can be almost all accounted for though evidence, including phone records, employment records, and other documents and testimony that will be provided during this proceeding.  Dan Capel did not live with Defendant.  Dan Capel did not spend any meaningful time at all with Defendant.  Instead, except when Dan Capel was traveling overseas for his work (which can be documented), he spent his time with Ms. Norman and other family and friends in their immediate social circle.

52.     Moreover, phone and email records will show that Dan Capel spent almost no time speaking with Defendant or writing to Defendant. For example, Defendant and Dan Capel only emailed a handful of times over the past several years.  What little interaction Dan Capel had with Defendant involved Defendant demanding more money from him (or something from him).

53.     All the while, Dan Capel spent his free time with Ms. Norman.  They travelled together, went to events together, went to social functions together and otherwise lived as one would expect a married couple to live.

54.     Sadly, the love story of Ms. Norman and Dan Capel, as well as their marriage, were cut short by his untimely and unexpected death.  On May 28, 2016, Dan Capel died of a pulmonary embolism.  Dan Capel was with his wife, Ms. Norman, at the house they shared in Hertford, NC, when he became ill.  Ms. Norman rushed her husband to the hospital.  He was pronounced dead at 11:29 a.m. at a local Emergency Room in Elizabeth City, NC.

55.     Ms. Norman held Dan Capel's hand as he died.  Defendant, in contrast, was in her home in Pennsylvania with no knowledge of the situation.

56.     None of Dan Capel's close friends or family thought to call Defendant when Dan Capel passed away.  Instead, a gentlemen named John Hawley, who found out about Dan Capel's death from Ms. Norman within hours after his death, called Dan Capel's daughter to tell her.  Dan Capel's daughter (who knew very well that her dad was married to Ms. Norman) happened to be with Defendant at the time.  This is how Defendant even found out that Dan Capel had died.

57.     As stated above, Defendant has known that Dan Capel married Ms. Norman since the wedding happened.  Nevertheless, Defendant sprung into action on the day of Dan Capel's death – within hours of his death – by making claims based on a purported "will" from 2002.

58.     Defendant asserted that she was still married to Dan Capel and that she was entitled to all of his assets in death.  This was Defendant's initial response upon learning of Dan Capel's death: staking her claim for money and control.

59.     Rather than letting Dan Capel's wife, Ms. Norman, and his son, Harrison, grieve, the Defendant began stating right away that the purported will meant that she took everything from the Estate, including anything that was to go to his son Harrison.

60.     As discussed below, Defendant and Dan Capel had executed a Separation Agreement through which she agreed to give up rights to Dan Capel himself and any claim against his assets (other than those listed in the Agreement itself.)  Nevertheless, Defendant hid this Separation Agreement from Ms. Norman, Harrison and others while instead falsely claiming that she was entitled to all of Dan Capel's property as a result of an earlier-executed will.

61.     Defendant demanded that people who knew Ms. Norman inform her immediately of Defendant's purported claims of still being  married to Dan Capel and of Defendant's claims to all Dan Capel's assets.  To these messengers, Defendant made absolutely no mention of the existence of the Separation Agreement.

62.     These messengers, in later conversations, made clear that the Defendant told them that she was entitled to receive everything from the Estate.  The Defendant also told these messengers that Dan Capel had been taken off the deed to her house but was still responsible for the mortgage – a falsehood that is refuted by the Separation Agreement.

63.     Dan Capel's heart had stopped beating mere hours before Defendant began demanding to his son, Harrison, and his wife, Ms. Norman, that Defendant is to control the Estate and receive the assets.  Defendant's purpose from the very beginning was clear: she was trying to obtain money from her ex-husband's (or estranged former husband's) estate.  Her purposeful withholding of a document demonstrating otherwise reveals her craven behavior.

64.     Ms. Norman, knowing that she was in fact Dan Capel's wife, did her best to deal with this difficult time despite Defendant's shameless actions.  Dan Capel's family (father, mother and other relatives) came to Hertford, NC to share in Ms. Norman's grief.  Dan Capel's close friends came to Hertford, NC to share in her grief. Everyone who was close to Dan Capel grieved together in North Carolina.

65.     Had the Defendant had any relationship with Dan Capel other than payor/payee, one would have expected Dan Capel's family and friends to go to Pennsylvania – where Defendant claims Dan Capel lived.  But they did not.

66.     Nevertheless, Ms. Norman tried her best to ignore the ranting from Defendant.  Ms. Norman tried her best to ignore the fact that Defendant demanded all the

money from the Estate—even though Defendant had not lived with Dan Capel for ten years.

67.     Instead, Ms. Norman had three priorities in those first few days.  First, her intention was to grieve in peace with Dan Capel's family and friends.  Defendant refused to let that happen.

68.     Second, Ms. Norman wanted to carry out Dan Capel's wishes that he be cremated.  Dan Capel had told Harrison, his father, Ms. Norman, several of his friends, and others that he wanted to be cremated if he died.  In fact, Dan Capel had told his son Harrison, his father and Ms. Norman on two occasions—family funerals—where all three were together (and Defendant was not there) that he wished to be cremated.  Ms. Norman dutifully sought to uphold Dan Capel's wish and therefore had him cremated.

69.     Third, Ms. Norman set out to complete the process to have Dan Capel buried in Arlington National Cemetery, an honor befitting her husband – such a hero.

70.     In response, the Defendant began to threaten Harrison, Ms. Norman, a funeral home, the hospital, and anyone else she could think of.  She immediately began threatening lawsuits against everyone and making demands that only she could control what happened with Dan Capel's assets and remains.

71.     The Defendant even had a lawyer from Texas call Ms. Norman and threaten to have Ms. Norman put in jail if she did not do exactly what Defendant wanted.  Again, Defendant and her Texas lawyer knowingly kept from Ms. Norman the existence

of the Separation Agreement and the fact that this Agreement specifically provided that Defendant did not have these rights.

72.    Defendant quickly brought a lawsuit against Ms. Norman in North Carolina.  Defendant alleged that she had suffered emotional distress due to Dan Capel's cremation.  Defendant further alleged that Defendant had the right to all of Dan Capel's property and his body, and that Ms. Norman had somehow "converted" that property.

73.    Defendant's lawsuit is one of many attempts to defraud Plaintiffs—as well as various courts.  Defendant's complaint, affidavit, and application for a temporary restraining order are replete with falsehoods and cunning deceptions.

74.    For example, Defendant falsely portrayed that she was living with Dan Capel and essentially that he had been passing through North Carolina when he died.  This is laughable.  Dan Capel had not lived with Defendant for ten years prior to his death.  Dan Capel spent his time at his home in Hertford, NC with Ms. Norman.  Dan Capel spent his time with Ms. Norman, not with Defendant.

75.    In fact, upon information and belief, Dan Capel had not spent even one night with Defendant in many years.  Documents, phone and other records, and testimony adduced in the proceeding will confirm this.  Yet, Defendant tried to falsely portray to the North Carolina court that Dan Capel was just on a short business trip and that a near-stranger (Ms. Norman) had somehow cremated Dan Capel against her wishes.   It is not surprising that the NC court issued a temporary restraining order based on the Defendant's false allegations.

76.     In addition to knowingly making false claims, the Defendant and her lawyers hid the Separation Agreement from Ms. Norman, Dan Capel's son, Harrison Capel, and the Court in North Carolina, knowing that the Separation Agreement showed that the Defendant did not have the rights she was demanding in the North Carolina court.

77.     In the court affidavit and pleadings, Defendant represented to the North Carolina court that she was entitled to all the assets from Dan Capel's estate. Yet the Separation Agreement provides expressly that "each party hereby waives and relinquishes any and all rights he or she may now have or hereafter acquire . . . to share in the property or the estate of the other as a result of the marital relationship, including, . . . [a] right to take against the Will of the other . . . ."  (See Ex. A).

78.     The Separation Agreement was executed years after the Will, rendering any such provision in the Will as void.

79.     The Separation Agreement contained other provisions showing that Defendant did not have the rights she claimed.  The Separation Agreement provides that, going forward, Dan Capel would be "free from interference, authority, contact and control, direct or indirect, by the [Defendant] as fully as if he . . . were single and unmarried, . . . ." (See Ex. A).  Through the Separation Agreement, Dan Capel had made sure he would be free from interference by Defendant for the rest of his life. Nevertheless, Defendant has used his death to try to interfere with him again.

80.     This Separation Agreement could hardly have been more favorable to the Defendant. In addition to requiring Dan Capel (and Ms. Norman) to pay large monthly sums to Defendant (considering that Dan Capel had been a sailor and then a government

employee), the Separation Agreement also provided that Dan Capel would pay to keep Defendant's horses, for her schooling, etc.  Dan Capel gave everything he had at that point to the Defendant, and received nothing.  This became even worse when the Defendant later violated all the provisions whereby she had obligations to Dan Capel.

81.     Because of the Defendant's flagrant and continuing violations of the Separation Agreement, the Estate is seeking a return of Dan Capel's interest in the house in Pennsylvania as part of this litigation.

82.     It is important to note that Defendant hid this Separation Agreement from the NC Court, Ms. Norman and Harrison.   Defendant obtained a TRO based on her allegations and arguments that were directly contradicted by this Separation Agreement.

83.     Again, the reasons for Defendant's hiding the Separation Agreement are clear: she wanted to receive the assets from the estate of Dan Capel despite clearly relinquishing such rights in the Separation Agreement.

84.     Defendant's interference, abusive conduct and fraud continued.  While Harrison and Ms. Norman, along with scores of Dan Capel's close friends and his family from far and wide, met together at Dan Capel's favorite restaurant to celebrate his life, Defendant blanketed that very same area with obituaries claiming to be Dan Capel's wife and omitting entirely Ms. Norman.  Defendant did this on the very same weekend, and in the very same location, that Harrison and Ms. Norman were holding this celebration.

85.     Defendant lives in Pennsylvania. Defendant alleges (falsely and fraudently) that Dan Capel lived with her in Pennsylvania.  Yet she chose to blanket the Virginia

Beach, Virginia area with obituaries on the very same weekend when Dan Capel's wife, Ms. Norman, and his son were holding a celebration there.

86.     Again, the reason for Defendant to put out obituaries in the Virginia Beach area were clear: she was trying to establish (falsely) her credibility as Dan Capel's "wife" so that she could steal the estate's assets from Harrison and Ms. Norman.

87.     Out of an abundance of respect, Harrison decided to not bring his dad's remains to the celebration in Virginia Beach.  Expectedly, Defendant did not return the favor.  Defendant repeatedly demanded that Harrison and/or Ms. Norman turn over Dan Capel's remains to her so that she could display them at an event she planned the following week.

88.     Again, with no respect for anyone—dead or alive—Defendant wanted to try to legitimate her claim to all of Dan Capel's assets by parading his remains around her event.

89.     Defendant continued her fraudulent efforts by apparently starting a probate action in Pennsylvania.  This probate action is fraudulent.  Defendant's lawyer knows that this probate action is fraudulent and yet still maintains the action.

90.     Under Pennsylvania law, in order to have a probate action in Pennsylvania, the deceased must either have lived in Pennsylvania, must have died there or must have property there such as a house.

91.     Here, as Defendant and her lawyer know, none of these requirements are present.  Dan Capel died in North Carolina, where he has lived since September 2014 with Ms. Norman.

92.     Dan Capel did not own any property in Pennsylvania.  Dan Capel had owned a house in Pennsylvania with Defendant.  But Dan Capel had not resided in that house in Pennsylvania for ten years, i.e., when he separated from Defendant.  In fact, as part of the Separation Agreement, Dan Capel agreed to sign over the deed to the property to Defendant, which he did.  So Dan Capel owned no real property in Pennsylvania.

93.     This is why, when the Defendant previously filed the vexatious and "frivolous" unrelated claim referred to above, relating to her house in Pennsylvania, she made absolutely no mention of Dan Capel.

94.     Dan Capel did not live in Pennsylvania.  Upon information and belief, and as will be shown through documents and testimony, Dan Capel had not spent one overnight at Defendant's house for more than two years.  Dan Capel had lived exclusively with Ms. Norman, as Defendant was aware, for several years in Washington D.C., and then in North Carolina.

95.     In addition, Dan Capel had no intention of any sort to ever return to Pennsylvania.  Dan Capel had signed away the deed to the house in Pennsylvania.  Dan Capel had signed a Separation Agreement with Defendant that prevented any interference from her; the two were to live as though they were single and unmarried.  The Separation Agreement was signed months before Dan Capel married Ms. Norman, showing the

reasons why Dan Capel wanted Defendant to leave him alone.  This is the opposite of an intent to return.  It is a complete and permanent separation.

96.     Speaking of the Separation Agreement, upon information and belief, Defendant hid this agreement from the Pennsylvania probate court as well. In that court, Defendant is demanding all of Dan Capel's assets, to the detriment of Harrison and Ms. Norman, without letting that court know that she has expressly waived any rights to share in the property or the Estate.

97.     The Defendant has also misrepresented to the Pennsylvania probate court about where Dan Capel lived.  He lived in North Carolina.

98.     Thus, the Pennsylvania probate action is fraudulent and is designed to steal assets from Dan Capel's son, Harrison, and his wife, Ms. Norman, in a distant forum.

99.     Defendant, together with Co-defendants (Does 1 through 9), have engaged in fraud and further tried to convert other assets that belong to Harrison, Ms. Norman and the Estate.

100.    For example, Defendant is trying to take from Plaintiffs survivor benefits and other rights to which she is not entitled.

101.    Defendant and Co-defendants have even tried to prevent Dan Capel's son Harrison from receiving life insurance proceeds for which Dan Capel had named his son as a beneficiary.

102.     Defendant and Co-defendants have no desire to implement Dan Capel's wishes but instead solely want his assets, as well as to engage in an harassment campaign fueled by spite and malice.

103.     To that end, Defendant has contacted several agencies in Washington, D.C. in order to further her fraud.  For example, Defendant called the Defense Finance Accounting Service in Washington, D.C, in order to obtain survivor and other military benefits (above and beyond retirement benefits).   Under the Separation Agreement, even were Defendant still technically married to Dan Capel, Defendant had agreed to waive any rights to take most benefits related to Dan Capel's military service (other than retirement benefits).  Yet Defendant has sought and is in the process of obtaining certain non-retirement benefits from Dan Capel's military service that should go to his rightful heirs, his son, Harrison, and his wife, Ms. Norman.[2]

104.     Defendant contacted the National Cemetery Administration, which is likewise in Washington, D.C., to try to cancel the application to have Dan Capel buried in Arlington National Cemetery.  She did this despite the fact that the purported will upon which she relies states that Dan Capel is to be buried with full military honors. Defendant is seeking to assert herself as Dan Capel's wife and to receive the benefits from the National Cemetery Association in connection with being Dan Capel's wife.  Yet the Separation Agreement states that Defendant has waived all rights to benefits from Dan Capel, other than those enumerated in the Separation Agreement, which such

---

[2] The Separation Agreement provides that the Defendant has rights to Dan Capel's retirement benefits for his military service.  But this does not extend to non-retirement benefits, such as survivor benefits.  The Defendant in the Separation Agreement agreed to waive any future right to such benefits.

benefits are not.  The Separation Agreement further states that Dan Capel is to be free from interference from Defendant and shall be treated as single and unmarried.

105.    Defendant has admitted that she stopped the funeral preparations for Dan Capel at Arlington National Cemetery so that she can control the service, i.e. exclude Dan's wife, Ms. Norman, and his son, Harrison.

106.    Most perniciously, Defendant and/or her Co-Defendants have contacted Federal Employees' Group Life Insurance Program ("FEGLI") in order to defraud FEGLI and to steal life insurance proceeds from Harrison.  FEGLI is located in Washington, DC and oversees the U.S. government life insurance benefits.  The Defendants have made false and fraudulent statements to FEGLI to deprive Harrison of his life insurance proceeds for which Dan Capel named him as the beneficiary.

107.    As stated above, Harrison is a recently-retired Marine who is exploring various business opportunities.  Harrison is in need of these life insurance proceeds.  But FEGLI, due to false statements from the Defendants, and not processing the life insurance.

108.    Upon information and belief, the Defendant also contacted other government agencies in Washington D.C. to determine whether Dan Capel had any benefits that she could try to take.  Some of these included, upon information and belief, the Department of Veteran Affairs and the Defense Intelligence Agency.

109.    Defendant, through her own accord and through the use of confederates and Co-defendants, sought to gain information about the assets of Dan Capel.  As an

initial matter, Defendant had to do this because she had been separated from Mr. Capel for ten years and did not know the extent of his assets and business interests.

110.     Defendant, upon information and belief, entered into an illicit arrangement with a person whereby the person would find out what assets Dan Capel had so that Defendant and her Co-defendants could steal those assets from Plaintiffs.   Upon information and belief, the Defendant has agreed to share proceeds from Dan Capel's estate with those persons helping to locate assets through these false statements.

111.     Based on instructions from the Defendant, upon information and belief, these confederates and the Defendant herself made false representations to government agencies, business persons and others to try to obtain information about Dan Capel and, ultimately, to steal these benefits from Plaintiffs.

112.     Upon information and belief, these communications, both between the Defendants themselves and to other persons, were done by telephone, facsimile, email, U.S. mail and couriers like Federal Express.   These communications by the Defendants were knowingly fraudulent.   The Defendants also engaged in interstate travel to further their fraudulent actions to take assets away from Plaintiffs.

113.     In one such shameless episode, the Defendant had Dan Capel's daughter call a federal agency and pretend to be Dan Capel's wife, Ms. Norman.

114.     In another instance, the Defendant had someone call and pretend to be a business partner of Dan Capel's in order to find out information about a business of his.

Upon information and belief, Defendant engaged her Co-defendants several times to pretend to be persons they were not in an effort to obtain assets.

115.    In many other instances, the Defendant would engage in the fraud and misrepresentations herself.  She would accomplish this in many ways.  But one consistent feature was that the Defendant would hide key facts from these persons.   These hidden facts include both the Separation Agreement itself, as well her fraudulent statements and omissions about her relationship with Dan Capel.

116.    The Separation Agreement provides expressly that  "each party hereby waives and relinquishes any and all rights he or she may now have or hereafter acquire . . . to share in the property or the estate of the other as a result of the marital relationship . . . ."  Yet Defendant would tell these agencies and other persons that she was the sole person who was to receive any benefits from Dan Capel.

117.    In addition, Defendant and her confederates have tried to assert that Defendant had a loving marital relationship with Dan Capel.  Nothing could be further from the truth.  The Defendant had been estranged and separated from Dan Capel for ten years before his death.  Dan Capel expressed his desire to have nothing to do with the Defendant to his family and his friends.  He also, of course, expressed his desire to be apart from Defendant in the Separation Agreement where he agreed to pay large sums of money so that the Defendant would leave him alone.

118.    Defendant asserts that somehow she is still connected to Dan Capel because she files a tax return with his name on it.  Upon information and belief, the Defendant was filling out those returns, not Dan Capel.

119.     In fact, Defendant had no idea about what tax documents Dan Capel had when she was filling out his return.   Upon information and belief, the IRS sent the Defendant a deficiency notice from 2015 taxes because she submitted an incomplete tax form.   She did not even know all of the income of Dan Capel.   She simply had to guess— and guessed wrong.

120.     Defendant clearly committed fraud against the Internal Revenue Service when she listed Dan Capel's residence as Pennsylvania.   Dan Capel did not live in Pennsylvania, he lived and spent all his time in North Carolina, except when he was traveling with Ms. Norman or for work.    And he spent essentially no time in Pennsylvania—a matter of perhaps a few hours over the last year.   The Defendant signed this tax return even though she knew that Dan Capel's residence as being in Pennsylvania was false.

121.     Defendant also committed tax fraud against North Carolina.    Upon information and belief, Defendant has claimed in the tax return that Dan Capel was a Pennsylvania resident, and therefore that he was to pay Pennsylvania state taxes.   But, as stated previously, Dan Capel resided in North Carolina and spent all his time there.

122.     North Carolina has a residency counting requirement, meaning that if a person is in North Carolina for 183 days or more, that person is subject to North Carolina taxes.   Thus, Dan Capel should have paid North Carolina state taxes, not Pennsylvania. Defendant knew this but, upon information and belief, filled out tax forms for Dan Capel to pay taxes in Pennsylvania.   Defendant did this so that she could continue to assert that

Case 1:16-cv-01636-RJL   Document 1   Filed 08/11/16   Page 27 of 50

she was somehow connected to Dan Capel.  Defendant's actions have defrauded North Carolina.

123.    Based on the Defendant's falsehoods and misleading assertions, it is indeed possible that the Defendant was forging Dan Capel's name on the tax returns.

124.    Defendant also claims that she and Dan Capel never divorced.   Her word for that cannot be trusted, absent proof.   Her history of deception and misleading statements does not allow her to have the benefit of the doubt.

125.    A court in Pennsylvania has already taken the Defendant to task for filing a frivolous action.

126.    Dan Capel has told his close family members—his mom, dad, sister, son, and others—that he and the Defendant were divorced.  The family members will all testify to this effect.

127.    Dan Capel also had told his close friends, long time friends, that he and the Defendant were divorced.  These friends will all testify about this.

128.    Dan Capel further told several friends and family members that he had sent the Defendant divorce papers that were filed.  Dan Capel represented to people repeatedly that he was divorced from the Defendant.  These people will all testify about this.

129.    Therefore, given the presumption of the validity of a marriage, given Dan Capel's repeated statements to people he knew that he was divorced from the Defendant,

27

and given Defendant's false assertions, a genuine question exists as to whether the Defendant is actually divorced from Dan Capel.

130.    After Dan Capel had passed, Defendant told someone that Dan Capel had signed and sent her divorce papers, but that she had failed to file them. Even if we were to accept this version of events, then a genuine question exists as to whether Defendant deceived Dan Capel about their divorce.

131.    More fundamentally, if Defendant and Dan Capel never technically obtained a divorce from a court, then Defendant has engaged in a two and a half year fraud.

132.    Defendant was told personally that Dan Capel had married Ms. Norman. But Defendant did nothing.  And said nothing.  And instead forced Dan Capel and, consequently, Ms. Norman to pay inordinate sums of money over the last two years for what Ms. Norman thought were alimony payments.

133.    The fact is Defendant sat by, knowing full well that Dan Capel had remarried, and hid the fact (if true) that she had never been divorced officially from Dan Capel.

134.    If Defendant was in fact never divorced from Dan Capel, which is a dubious proposition, this means that she waited until Dan Capel died to declare to Ms. Norman and the world that she was allegedly still married to Dan Capel.  This would be a shameful and unjust ruse.

135.    Recall that Defendant demanded that people tell Ms. Norman just hours after Dan Capel died that Defendant was allegedly still married to Dan Capel and that she had a "will."   Defendant did this within mere hours of his death.   Yet Defendant had known for two years that Dan Capel was married to Ms. Norman.

136.    Lastly, Defendant has told persons in Washington, D.C. that Ms. Norman is a "pretend" wife of Dan Capel.

137.    The Defendant has made all manner of defamatory statements about Ms. Norman.  For example, the Defendant told a person two days after Dan Capel died that Ms. Norman was not close with Dan Capel.

138.    In addition, Defendant has asserted falsely in public documents and to many of Dan Capel's friends that she was living exclusively with Dan Capel and that that Dan Capel was just traveling through North Carolina when he died.  Defendant has also stated that Ms. Norman was not in a loving relationship with Dan Capel.

139.    Defendant told a friend of Dan Capel's that Ms. Norman was refusing to honor Dan's wishes regarding his burial and was trying to steal him from Defendant. Defendant told this same exact falsehood to several other people who both knew Dan Capel and his wife Brooke Norman.

140.    Defendant's false statements have already caused significant harm to Ms. Norman.   These false statements have been made to people in a very close-knit professional and social community of people and former service members who value truth and honor.   This community includes not only Ms. Norman's and Dan Capel's

closest friends, but also people who work with Ms. Norman, people who serve as character witnesses for Ms. Norman during the security clearance process, and people whose judgment of Ms. Norman determines the course of her future employment. Defendant's false statements have not only jeopardized Ms. Norman's ability to continue to serve her country but also the country's ability to continue to rely on Ms. Norman for protection.

141.    The Defendant's defamation is only one pernicious aspect of her actions. The Defendant is seeking to use a purported continuing relationship with Dan Capel to obtain further business interests.  Dan Capel was a respected member of the SEAL and defense communities, among others.  The Defendant, along with her Co-Defendants, want to use Dan Capel's reputation to further their business interests to the detriment of Harrison and Ms. Norman.

142.    Harrison, as the son of Dan Capel, rightfully expected to benefit from his father's reputation in order to obtain business opportunities.  Unfortunately, Dan Capel passed away.  Nevertheless, being Dan Capel's son carries a certain cachet that will continue to benefit Harrison.  This is the same with Ms. Norman, as being Dan Capel's wife.

143.    The Defendant seeks to deprive Harrison and Ms. Norman of these opportunities by asserting falsely that she was the one close to Dan Capel.   The Defendant, and her Co-Defendants, will continue to make false statements and engage in other wrongdoing to trade off on Dan Capel's name in their shameless way.

144.    Dan Capel, his son, and his wife Ms. Norman deserve better.

## COUNT I
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
## CONDUCTING THE AFFAIRS OF THE ENTERPRISE THROUGH A
## PATTERN OF RACKETEERING ACTIVITY
### (Against All Defendants)

145.    Plaintiffs Harrison Capel, Brooke Norman and the Estate of Thomas Capel incorporate each of the above allegations as if restated fully herein.

146.    From on or about April 2014, continuing through the filing of this Complaint, Defendants, as well as their agents and employees, together with others, both known and unknown, formed an associated-in-fact Enterprise within the meaning of 18 U.S.C. §1961(4).

147.    From April 2014, continuing through the filing of this Complaint, the Enterprise engaged in and took place in activities that affected interstate and foreign commerce.

148.    Defendants formed the Enterprise to execute and to attempt to execute a scheme to defraud Plaintiffs of money and property.

149.    From April 2014, continuing through the filing of this Complaint, Defendants, individually and together with others, both known and unknown to Plaintiffs, were employed or were employed by and associated with the Enterprise and have in the past, continuously and currently continue to, in an ongoing manner, knowingly and intentionally, conducted the activities of the Enterprise, directly or indirectly, through a continued pattern of racketeering activity consisting of numerous acts of racketeering in Washington, D.C., North Carolina, Pennsylvania, and elsewhere.  As set forth below, the actions of all of the entities above include multiple, related acts in violation of the following provisions of the United States Code: Mail Fraud, 18 U.S.C. §1341; Wire

Fraud, 18 U.S.C. §1343; Travel Act, 18 U.S.C. §1952; and the Hobbs Act, 18 U.S.C §1951, with the ultimate goal of defrauding Plaintiffs.

150.    Mail Fraud (18 U.S.C. §1341): On or about the dates indicated throughout this Complaint, Defendants and their employees and/or agents acting on their behalf, aided and abetted by each other and the remaining Defendants, used the United States mails and/or private or commercial interstate carriers in furtherance of a scheme to defraud Plaintiffs of money and property in violation of 18 U.S.C. §1341 (Mail Fraud) and 18 U.S.C. §2, as described in this Complaint.

151.    Wire Fraud (18 U.S.C. §1343): On or about the dates indicated throughout this Complaint, Defendants and their employees and/or agents acting on their behalf, aided and abetted by each other and the remaining Defendants, used interstate wires in furtherance of a scheme to defraud Plaintiffs of money and property, in violation of 18 U.S.C. §1343 (Wire Fraud) and 18 U.S.C. §2, as described in this Complaint.

152.    Travel Act (18 U.S.C. § 1952): On or about the dates indicated throughout this Complaint, Defendants and their employees and/or agents acting on their behalf, aided and abetted by each other and the remaining Defendants, traveled across state lines in furtherance of a scheme to defraud Plaintiffs of money and property, in violation of 18 U.S.C. §1343 and 18 U.S.C. §2, as described in this Complaint.

153.    Hobbs Act (18 U.S.C. § 1951): On or about the dates indicated throughout this Complaint, Defendants and their employees and/or agents acting on their behalf, aided and abetted by each other and the remaining Defendants, traveled across state lines and used mail and wires to obstruct, delay, and otherwise affect commerce by extortion or attempts or conspired to do so, in furtherance of a scheme to extort and rob Plaintiffs

of money and property, in violation of 18 U.S.C. §1343 and 18 U.S.C. §2, as described in this Complaint.

154.    The persons alleged herein to have violated 18 U.S.C. §1962(c) are separate from, though employed by or associated with, Defendants, as well as Defendants themselves.

155.    Each Defendant had a role in the racketeering activity that was distinct from the undertaking of those acting on its behalf.

156.    Each Defendant attempted to benefit, and did benefit, from the activity of their employees and agents alleged herein, and thus were not passive victims of racketeering activity, but rather were active perpetrators.

157.    The enterprise continues to act and will continue to engage in unlawful means as described above.

158.    Plaintiffs have been injured in their business or property as a direct and proximate result of Defendants' violations of 18 U.S.C. §1962(c), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

159.    As a result of the violations of 18 U.S.C. §1962(c) by Defendants, Plaintiffs have suffered substantial damages in an amount to be proved at trial.

160.    Pursuant to 18 U.S.C. §1964(c), Plaintiffs are entitled to recover treble damages for both its general and special compensatory damages, plus interest, costs and attorneys fees, incurred by reason of Defendants' violations of 18 U.S.C. §1962(c).

161.    WHEREFORE, Plaintiffs demand judgment against each of the Defendants to recover treble damages of at least $900,000 for its general and special compensatory damages, plus interest, costs and attorney's fees.

**COUNT II**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**CONSPIRACY TO CONDUCT THE AFFAIRS OF THE**
**ENTERPRISE THROUGH A PATTERN OF RACKETEERING**
**ACTIVITY IN VIOLATION OF §1962(C)**
(**Against All Defendants**)

162.     Plaintiffs Harrison Capel, Brooke Norman and the Estate of Thomas Capel

incorporate each of the above allegations as if restated fully herein.

163.     Beginning on or about April 2014, and continuing through the time of

filing this Complaint, Defendants, and others unknown, being persons employed by and

associated with the Enterprise, did unlawfully, knowingly and intentionally conspire,

combine, confederate and agree together to conduct of the affairs of the Enterprise, which

was engaged and involved in the activities, which affected interstate and foreign

commerce, through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

164.     Each Defendant agreed that at least (2) two acts of racketeering activity

would be committed by a member of the conspiracy in furtherance of the Enterprise.

165.     It was part of the conspiracy that Defendants and their co-conspirators

would commit numerous acts of racketeering activity in the conduct of the affairs of the

Enterprise, including but not limited to, the acts of racketeering set forth herein.  The

pattern of racketeering activity, as defined by 18 U.S.C. §1961(1) and (5) includes

multiple repeated acts of:

> (i)      Mail Fraud, 18 U.S.C. §1341, as described in this Complaint;
> (ii)     Wire Fraud, 18 U.S.C. §1343, as described in this Complaint;
> (iii)    Travel Act, 18 U.S.C. §1952, as described in this Complaint;
> (iv)     Hobbs Act, 18 U.S.C. §1951, as described in this Complaint;

166.    In furtherance of this unlawful conspiracy, and to effect its objectives, Defendants committed numerous overt acts, including but not limited to those set forth in throughout this Complaint.

167.    Plaintiffs have been injured in its business or property by reasons of Defendants' violations of 18 U.S.C. §1962(d), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

168.    As a result of the conspiracies between and among all of the Defendants to violate 18 U.S.C. §1962(c), Plaintiffs have suffered substantial damages, in an amount to be proved at trial.

169.    The enterprise continues to act and will continue to engage in unlawful means as described above.

170.    Pursuant to 18 U.S.C. §1964(c), Plaintiffs are entitled to recover treble damages for both its general and special compensatory damages, plus interest, costs and attorney's fees, by reason of Defendants' violations of 18 U.S.C. §1962(d).

171.    WHEREFORE, Plaintiffs demands judgment against each of the Defendants to recover treble damages of at least $900,000 for its general and special compensatory damages, plus interest, costs and attorney's fees.

## COUNT III
## CONVERSION
### (Against All Defendants)

172.    Plaintiffs Harrison Capel, Brooke Norman and the Estate of Thomas Capel incorporate each of the above allegations as if restated fully herein.

173.    Plaintiffs have the right to possess the personal property of Dan Capel. Harrison is Dan Capel's son and next of kin.  Ms. Norman was Dan Capel's wife at the

time of his death.  The Estate has the right to collect the property of Dan Capel so that this property can be properly distributed to Dan Capel's rightful beneficiaries.

174.    Any rights that the Defendant has to Dan Capel's property are set forth in the Separation Agreement, which expressly states that she "relinquishes any and all rights . . . to share in the property or the estate of [Dan Capel] as a result of the marital relationship."  (See Exh. A.)

175.    Despite the express provision in the Separation Agreement whereby Defendant relinquished her marital rights to Dan Capel's property, Defendant has intentionally and wrongfully called several government agencies seeking survivor and other benefits on account of her alleged marital relationship with Dan Capel.  Certain of these benefits are not included as Defendant's rights in the Separation Agreement and, therefore, rightly belong to Plaintiffs.

176.    Upon information and belief, Defendant has intentionally and wrongfully obtained certain of these benefits belonging to Plaintiffs.

177.    Defendant's actions have deprived Plaintiffs of possession or use of the property in question.

178.    Although damages are not required to prevail on a claim of conversion under DC law, Plaintiffs here have already suffered damages, the extent of which will be determined through discovery.

### COUNT IV
### INTENTIONAL INTERFERENCE WITH A
### PROSPECTIVE ECONOMIC ADVANTAGE
**(Against All Defendants)**

179.    Plaintiffs Harrison Capel, Brooke Norman and the Estate of Thomas Capel incorporate each of the above allegations as if restated fully herein.

180.    Plaintiffs validly expected to receive the economic advantage of certain of Dan Capel's survivor benefits as his (i) estate; (ii) next of kin; and (iii) wife at the time of his death.

181.    Defendant knew Dan Capel remarried Ms. Norman and, therefore, she would have certain rights as his spouse.  At the very least, Defendant knew that she had forfeited her rights to certain benefits in the Separation Agreement such that those benefits would go to Plaintiffs (Dan Capel's estate and next of kin).

182.    Nevertheless, Defendant interfered with Plaintiffs' rights to this economic advantage by acting to obtain these financial benefits on account of her alleged marital relationship to Dan Capel, despite the fact that such benefits rightly belong to Plaintiffs

183.    Plaintiffs have been damaged by Defendant's actions through their loss of benefits conferred upon Defendant that should have gone to Plaintiffs—the extent of which will be determined through discovery.

## COUNT V
## FRAUDULENT MISREPRESENTATION
### (Plaintiff Brooke Norman)
### (Against Defendant Laura Capel)

184.    Plaintiff Brooke Norman incorporates each of the above allegations as if restated fully herein.

185.    Defendants, jointly and severally, intentionally made false statements of fact and representations to Plaintiffs, or intentionally omitted relevant facts from their statements and representations to Plaintiffs, regarding certain then current and

prospective conditions as set forth in the above, for the purpose of inducing Plaintiffs to provide monetary and other benefits to Defendants, including substantial sums of money.

186.    For example, Defendants knew that Ms. Norman believed that Dan Capel was divorced from Defendant, Laura Capel, and yet withheld from Ms. Norman what they now claim, i.e. that the divorce was never actually filed.  Upon information and belief, the Defendants represented to Ms. Norman that Dan Capel was in fact divorced from Defendant Laura Capel.  Ms. Norman relied on these fraudulent misrepresentations and material omissions to her great financial detriment.

187.    Additional statements and material omissions were made by Defendants to Plaintiffs and are set forth above and contained in written correspondence.

188.    Defendants knew, or should have known, that said representations were false when they were made, or knowingly omitted telling Ms. Norman the truth when Defendant should have done so.

189.    Defendant made her false statements, or omitted telling Ms. Norman the truth, with regard to Defendant's marital status, Dan Capel's marital status, the existence of the Separation Agreement, and the purpose of the payments from Dan Capel to Defendant.

190.    Defendants knew that making these false statements or withholding material information would induce Ms. Norman to assist Dan Capel in making these supposed alimony payments, directly and/or indirectly, to Defendant Laura Capel.

38

191.    Defendants made the statements, representations or omissions intending that Ms. Norman would rely on the false statements or omissions.

192.    Ms. Norman in fact relied upon Defendants' false statements or omissions and was in fact induced into giving money and property to Defendant.

193.    Ms. Norman was damaged as a result of Defendants' false statements of fact and misrepresentations.

194.    WHEREFORE, Plaintiff, Ms. Norman, demands judgment against Defendants, jointly and severable, for damages in excess of $300,000, costs and such other further and different relief as the Court may deem just proper and equitable under the circumstances.

## COUNT VI
## NEGLIGENT MISREPRESENTATION
### (Plaintiff Brooke Norman)
### (Against Defendant Laura Capel)

195.    Plaintiff Brooke Norman incorporates each of the above allegations as if restated fully herein.

196.    Defendants, jointly and severally, made statements and representations, or made material omissions, to Ms. Norman, regarding, among other things, that Defendant Laura Capel was not still married to Dan Capel and otherwise as set forth in above, which Defendants may have thought were true at the time they were said, but were in fact false. Said statements were made for the purpose of inducing Ms. Norman to give Defendant financial and other benefits.

197.    For example, Defendants repeatedly represented to, or withheld material information from, Ms. Norman that the amounts she was paying to Defendant Laura Capel was for alimony.  Defendants also made representations or withheld material information to Ms. Norman that other payments made by Ms. Norman to Defendant Laura Capel, both directly and indirectly, were related to payments in connection with a divorce agreement between Ms. Norman's husband and Defendant Laura Capel. Additional statements were made by Defendants to Ms. Norman and are set forth elsewhere in this Complaint.

198.    Defendants were negligent in making their statements and representations because they should have known that their statements were false when made and/or they were negligent in withholding material information.

199.    Defendants made the statements or representations intending or expecting Ms. Norman to rely on them.

200.    Ms. Norman did in fact rely upon Defendants' statements, representations and material omissions and paid several hundreds of thousands of dollars, both directly and indirectly, to Defendant  and ultimately to the other Defendants.

201.    Ms. Norman was damaged as a result of Defendant's misrepresentations, false statements of fact and material omissions.

202.    WHEREFORE, Plaintiff, Ms. Norman, demands judgment against Defendants, jointly and severable, for damages in excess of $300,000, costs and such

other further and different relief as the Court may deem just proper and equitable under the circumstances.

## COUNT VII
## COMMON LAW FRAUD
### (Against All Defendants)

203.     Plaintiffs Harrison Capel, Brooke Norman and the Estate of Thomas Capel incorporate each of the above allegations as if restated fully herein.

204.     Fraud requires (1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation

205.     As discussed in the Complaint, Defendant, by herself and with the help of other Defendants, has made false representations and withheld material facts to various government agencies in Washington, D.C. to fraudulently obtain benefits.  These statements were fraudulent.  The Defendants knew that these statements were fraudulent when made.  Upon information and belief, Defendant has been advised directly by a lawyer that some of these statements were fraudulent, yet she has continued to make them.

206.     Defendants have made these fraudulent statements with the intent to deceive various persons, including but not limited to Plaintiffs.

207.     Plaintiffs have taken action in reliance on these false statements and material omissions to their detriment.  Various government officials and business persons

have likewise relied on these false statements and material omissions to Plaintiffs' detriment.

208.     Plaintiffs have been damaged by the acts of Defendants in an amount to be determined at trial but already having exceeded $100,000.

**COUNT VIII**
**CIVIL CONSPIRACY**
**(Against All Defendants)**

209.     Plaintiffs Harrison Capel, Brooke Norman and the Estate of Thomas Capel incorporate each of the above allegations as if restated fully herein.

210.     Civil conspiracy requires (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner;  (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement;  (4) which overt act was done pursuant to and in furtherance of the common scheme.

211.     The acts of each of the Defendants regarding fraud, fraudulent inducement, negligent misrepresentation, conversion and intentional interference with a prospective economic advantage, are part of a conspiracy between that Defendant and the other Defendants and, as such, all acts are attributable to all Defendants.

212.     Each Defendant has agreed to take part in the conspiracy and to, specifically, participate in an unlawful manner.

213.     Each of the Defendants has committed at least one overt act in connection with this conspiracy.  Such actions have harmed each of the Plaintiffs.

214.     These acts were done in furtherance of the common scheme to defraud

Plaintiffs, to convert Plaintiff's property and to otherwise do harm to Plaintiffs.

215.     Plaintiffs have been damaged by the acts of the Defendant in an amount to

be determined at trial but already having exceeded $300,000.


## COUNT IX
## DEFAMATION AND DEFAMATION PER SE
### (Plaintiff Brooke Norman)
### (Against Defendant Laura Capel)

216.     Plaintiff Brooke Norman incorporates each of the above allegations as if

restated fully herein.

217.     Defendant has made numerous false and unprivileged statements about Ms.

Norman to people inside and outside the District of Columbia.

218.     Defendant's false statements were made with malice because Defendant

knew at the time that the statements were made that the statements were false.

219.     Defendant's false statements accuse Ms. Norman of behavior that is

odious, infamous, and ridiculous.

220.     Defendant's false statements have injured Ms. Norman in her profession

and her standing in the community.


## COUNT X
## EQUITABLE ESTOPPEL
### (Plaintiff Brooke Norman)
### (Against Defendant Laura Capel)

221.     Plaintiff Brooke Norman incorporates each of the above allegations as if

restated fully herein.

222.     A party raising equitable estoppel must show that she changed her position prejudicially in reasonable reliance on a false representation or concealment of material fact which the party to be estopped made with knowledge of the true facts and intent to induce the other to act.

223.     For the time they were married, Ms. Norman regularly assisted Dan Capel financially in making what she thought were his alimony payments to Defendant.  In fact, as previously outlined, the married couple made significant changes to allow them— together as a couple—to afford his alimony payments to Defendant.  The married couple moved from Washington, D.C. to North Carolina specifically to find more affordable housing to allow them to make his alimony payments.

224.     Had Ms. Norman known that Defendant was allegedly still married to Dan Capel, she would have insisted that he obtain a divorce before she would agree to marry him and she would most certainly not have shared in his payment obligations to Defendant.

225.     Upon information and belief, Defendant knew that Ms. Norman married Mr. Capel and was assisting him financially in keeping up with what Ms. Norman believed were his alimony payments.

226.     Moreover, if Defendant's allegations regarding her marriage to Dan Capel prove correct, she knew at the time she was receiving these checks, made up of Ms. Norman's and Mr. Capel's funds, that these were not alimony payments and that she remained married to Dan Capel.

227.     Until Dan Capel's death, Defendant and Mr. Capel both concealed their marriage status from Ms. Norman. Defendant never once informed Ms. Norman that her marriage to him could be considered void. Defendant simply kept happily depositing the checks she received from the happily married couple.

228.     Upon information and belief, Defendant's concealment of what she contends is the truth (that she remained married to Dan Capel) was meant to induce Ms. Norman to continue to help Dan Capel make these payments.

229.     Defendant received thousands of dollars of Ms. Norman's money under the premise that Defendant and Dan Capel were divorced. Defendant should not now be allowed to reverse course in yet another attempt to obtain funds that should properly belong to Dan Capel's (i) estate; (ii) next of kin; and (iii) wife at the time of his death. Thus, Defendant should be estopped from holding herself out as Dan Capel's wife under the doctrine of equitable estoppel.

## COUNT XI
## BREACH OF THE SEPARATION AGREEMENT
### (Plaintiff the Estate of Dan Capel)
### (Against Defendant Laura Capel)

230.     Plaintiff Estate of Thomas Capel incorporates each of the above allegations as if restated fully herein.

231.     Defendant breached the Separation Agreement in a myriad of ways.

232.     For example, Defendant was obligated not to interfere with Dan Capel and to act as if they were single and unmarried. Yet Defendant immediately upon learning of

his death alleged to many people that she was his loving wife. She further alleged falsely that her and Dan Capel had been living together.

233.     Defendant further interfered with Dan Capel in several ways both before and after his death.  For example, Defendant has used the courts to attempt to take control of Dan Capel's most intimate thing – his body.

234.     Defendant has interfered with Dan Capel's wish expressed to multiple people – including his wife Ms. Norman and his son Harrison – that Dan Capel be cremated.

235.     Defendant has interfered with Dan Capel's wish that he be buried with full military honors.  Defendant has canceled for now the arrangements that were well underway to have Dan Capel buried in Arlington National Cemetery.

236.     Defendant has further breached the Separation Agreement by seeking control over Dan Capel's assets despite the Separation Agreement's express provision that she has no rights to certain property after the Separation Agreement.  This includes Defendant's craven attempts to steal the life insurance from Dan's son, Harrison (despite Dan Capel having named his son as one of the beneficiaries in the will).

237.     Defendant further breached the Separation Agreement by purposefully not assuming sole responsibility for the mortgage of their former shared house in Pennsylvania.

238.     The Separation Agreement provided that Dan Capel would sign over to Defendant his rights in their former marital home in Pennsylvania.  Dan Capel dutifully

did so, executing a lease to transfer the title of the house to Defendant.  In return, Defendant was supposed to assume the full mortgage on the house.  Defendant has not done so.

239.     Prior to the Separation Agreement being discovered, Defendant told persons associated with Dan Capel that she would obtain all of the Estate because she had full title of the house but that Dan Capel was responsible for the mortgage.  Defendant said this in an effort to cause the rightful heirs to abandon the Estate so that Defendant could have it for herself.   Thus, not only did Defendant breach the Separation Agreement, she also used her own breach to try to steal the assets of Dan Capel's estate from his rightful heirs.

240.     Defendant breached the Separation Agreement in other ways as well.

241.     The Estate seeks several remedies for Defendant's breach of the Separation Agreement.  First, the Estate seeks a return of all the amounts paid by Dan Capel (and Ms. Norman) to Defendant, which upon information and belief amounts to approximately $300,000.

242.     Second, the Estate seeks a return of Dan Capel's interest in the house in Pennsylvania such that he is entitled to half the value of the house.  Third, the Estate will seek other direct damages, as well as consequential damages, for Defendant's breaches.

243.     Wherefore, the Estate requests that the Court order damages in an amount at trial, disgorgement of amounts paid to Defendant under the Agreement, and a return of Dan Capel's interest in the house at its value prior to his passing.

**Count XII**
**Intentional Infliction of Emotional Distress**
**(Plaintiff Brooke Norman)**
**(Against Defendant Laura Capel)**

244.     Plaintiff Brooke Norman incorporates each of the above allegations as if restated fully herein.

245.     Defendant Laura Capel has engaged in a pattern of acts designed to intentionally inflict severe emotional distress on Ms. Norman.

246.     As but one example, on the very day that Ms. Norman watched her husband die, Defendant requested that several people tell Ms. Norman right away that she was allegedly still married to Dan Capel and that she was entitled to everything in the Estate.   Defendant did this even though she had known for more than two years that Dan Capel had been married to Ms. Norman.

247.     Defendant further intentionally made false statements to the various persons, including in a sworn affidavit, that she was living with Dan Capel and that Ms. Norman was just pretending to be with Dan Capel.

248.     Defendant used these false statements to try to rob Ms. Norman of any chance to grieve the loss of her husband.  She timed her statements to others and her actions against Ms. Norman to create the maximum emotional harm to Ms. Norman.

249.     Ms. Norman was in fact harmed severely by Defendant.  Ms. Norman has developed physical problems as a result of Defendant's intentional actions.

250.     Ms. Norman has suffered significant damages that will be proved in the proceeding.

## Jury Demand

251.     Plaintiffs Harrison Capel, Brooke Norman and the Estate of Thomas Daniel Capel demand a trial by jury in this case.

## Prayer for Relief

**Wherefore**, Plaintiffs pray for relief as follows:

252.     That judgment be entered in favor of Plaintiffs and against Defendant in an amount to be determined at trial.

253.     That Dan Capel's interest in the house in Pennsylvania be reinstated and the proceeds from the sale of the house be split.

254.     For recovery of attorney fees and costs incurred in pursuit of this action.

255.     For punitive damages.

256.     For such other relief as this court deems appropriate.

**Dated**, August 11, 2016:

BAKER & MCKENZIE

EDWARD BALDWIN
DC Bar No. 973850
GRAHAM CRONOGUE (pro hac
application forthcoming)
Baker & McKenzie LLP
815 Connecticut Ave, NW
Washington, DC 20006
(202) 452-7000
teddy.baldwin@bakermckenzie.com
graham.cronogue@bakermckenzie.com
*Attorneys for Plaintiffs*